# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND APPLICATION FOR ARREST WARRANT

I, Andrea N. Winternitz, a Special Agent with the Federal Bureau of Investigation ("FBI") in San Francisco, California, being first duly sworn, hereby depose and state the following:

## I. INTRODUCTION

1. There is probable cause to believe that DAVID TAWEI AN executed and conspired to execute a scheme and artifice to defraud a federal insured financial institution, in violation of 18 U.S.C. §§ 1344 and 1349. Specifically, as set forth in detail below AN sought a mortgage loan from the Navy Federal Credit Union, a federally-insured financial institution. AN was required demonstrate a prescribed level of income in order to qualify for the desired amount of his loan. AN did not have the necessary income and asked his friend to execute a fraudulent lease. This sham lease was intended to show rental income, which would supplement AN's true income and thereby qualify AN for a home mortgage loan for which he would not otherwise qualify. AN and his wife submitted the phony lease to the credit union as part of their loan application, and thereafter got the loan.

2. There is also probable cause to believe that DAVID TAWEI AN made a false and misleading statement to the Federal Bureau of Investigation ("FBI") in December 2018, in violation of 18 U.S.C. § 1001. Specifically, AN made false statements to FBI agents that he never received gifts from two agents of the Taiwan government.

## II. AGENT QUALIFICATIONS

3. I am a Special Agent of the FBI and have been so employed since September 2015. I am currently assigned to the San Francisco Field Division of the FBI, and work in the Counterintelligence Branch. I have received training at the FBI Academy in Quantico, Virginia, to include training in the preparation, presentation, and service of criminal complaints, and criminal investigations involving violations of federal law. Prior to joining the FBI, I graduated from the University of California ("UC"), Berkeley School of Law in 2010, and am currently a member of the California State bar. As an attorney, I have experience in researching and litigating complex financial and contractual disputes. During my career with the FBI, I have conducted multiple national security investigations. Additionally, I have written affidavits, executed search warrants, interviewed victims, interviewed suspects, and conducted

arrests. In particular, I have been involved in various investigations of White Collar Crimes including Mortgage Fraud and Wire Fraud.

4. The information contained in this affidavit is based on my personal knowledge and involvement in the investigation, on written and oral information provided by other law enforcement investigators assigned to this case, on information contained in records obtained by investigators, and on my own training, experience, and background as well as other information gathered during the course of this investigation.

5. This affidavit is submitted in support of an application for the issuance of an arrest warrant and criminal complaint charging "DAVID TAWEI AN ("AN") with violations of 18 U.S.C. §§ 1001, 1344, and 1349. Because this affidavit is being submitted for this limited purpose, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts I believe to be necessary to establish probable cause for the issuance of the requested warrant.

III. **APPLICABLE LAW**

6. Under 18 U.S.C. §1001, "whoever, in any matter within the jurisdiction of the executive, legislative or judicial branch of the Government of the United States, knowingly and willfully makes any materially false, fictitious, or fraudulent statement or representation" shall be fined or imprisoned for a term of not more than five years. Venue is proper in the judicial district in which a law enforcement agent is conducting an investigation, even if the alleged false statement was made in another district.

7. Title 18, U.S.C., § 1344 provides that "Whoever knowingly executes or attempts to execute, a scheme or artifice-- to defraud a financial institution; or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." Section 1349 of the same title provides the same penalties for entering into a conspiracy to violate § 1344, among other statutes.

8. The facts set forth in this affidavit are based in part on information that I have learned from interviews conducted by Special Agents of the FBI, recorded and written statements by AN and his

AFFIDAVIT OF FBI SA ANDREA N. WINTERNITZ 2

coconspirators, as well as a review of documents including bank records, loan files, and other financial records.

## IV. STATEMENT OF PROBABE CAUSE

### A. Relevant Individuals

9. AN, 39, is a United States citizen who resides in Washington D.C. (Washington). AN works part time as a Senior Research Fellow at a think tank based in Washington focused on U.S. policy toward Taiwan (Think Tank #1). Before moving to Washington, AN lived in California and served as a Senior Project Manager at a cleared defense contractor (CDC1) until July 2016. AN graduated UC, Berkeley in 2002 with a Bachelor of Arts in Science. AN's 2000-2001 academic year was spent abroad at Peking University. AN was awarded a Fulbright scholarship to study in Taiwan between September 2005 and June 2006. AN earned a Master's degree from UC San Diego, specializing in Pacific International Affairs in 2007. In 2009, AN began his full time career at the U.S. Department of State, as an action officer in the East Asia and Pacific (EAP) section of the Office of Regional Security and Arms Transfers. In this position, AN was responsible for drafting and coordinating notification to Congress for third-party transfers of U.S.-origin military equipment as required by Section 3 of the Arms Export Control Act (AECA). In addition to his part-time employment described above, AN is currently pursuing a Ph.D at Catholic University.

10. AN's spouse, Anne Yu An (hereinafter "Anne"), works as a Senior Security Researcher at a corporation in the Washington, D.C. area. After Anne married AN on April 30, 2009, she immigrated to the United States from Taiwan in November 2009.

11. Howard C. Young (aka: Chenhua Young) is a resident of San Jose, California. Young and AN both attended UC San Diego. Young, a former U.S. Marine reservist, has had an employment background in sales and technology.

12. Young is also associated with a business known as "Defense Sourcing.com." and maintains an e-mail account identified as howard.young@defensesourcing.com. According to open source information, "Defense Sourcing.com" facilitates foreign military sales with various international partners, including to Taiwan.

13. An individual (hereinafter "TAW1"), who is a Taiwanese official formerly assigned to the San Francisco Taipei Economic and Cultural Office ("TECO"), was the beneficiary of a non-immigrant visa (NIV), E-1 Treaty Trader, last issued on August 31, 2012, and valid through August 28, 2017. A previous NIV that TAW1 applied for in 2005 specified TAW1 was affiliated with the "NSB," Taiwan's National Security Bureau.

14. An individual (hereinafter "TAW2"), who is a Taiwanese official formerly assigned to the San Francisco TECO, was the beneficiary of an E-1 NIV, last issued on December 5, 2014, and valid through December 1, 2019.

15. An individual (hereinafter "TAW3"), is a Taiwanese official currently assigned to the San Francisco TECO, and a beneficiary of an E-1 NIV, last issued on February 22, 2016, and valid through February 18, 2021.

16. TAW1 had regular communications with AN in approximately 2015 - 2016. TAW2 and TAW3 have had frequent communications with AN since approximately 2015 and 2016, respectively.

B. **Taiwanese Institutions, Intelligence Services and Associated Terms:**

17. When the United States ended diplomatic relations with the Republic of Taiwan ("Taiwan") in 1979, Taiwan established "representative offices" known as the Taipei Economic and Cultural Representative Office ("TECRO") in Washington, D.C., and local Taipei Economic and Cultural Offices ("TECO") in other locales throughout the U.S., which handle visa applications as well as relations with local authorities.

18. The National Security Bureau ("NSB") is the principal intelligence agency of Taiwan. According to its public website, the Bureau's missions are: (1) collecting and acting upon intelligence related to national security; (2) strategizing and executing special service tasks; and (3) regulating and developing cryptology-related technology.

C. **AN's U.S. Government Service and Security Clearances**

19. AN's professional career has predominantly involved fields that required a national security clearance. From approximately 2004 - 2017, AN was employed at agencies and organizations where he has maintained various security clearances, ranging from Secret to Top Secret, on behalf of beneficiaries such as the Department of Defense (DOD) and the United States Department of State.

20. During his career with the State Department, AN signed and executed a Form SF-312, Classified Information Nondisclosure Agreement (NDA), on or about August 4, 2004. AN executed another NDA on February 4, 2009.

21. In 2004, AN was granted a Secret clearance on behalf of the State Department, for his position as an Intern at the EAP Bureau. AN was granted another Secret Clearance, on behalf of the State Department, in December 2008. In 2011, AN was granted a Top Secret security clearance for the benefit of the State Department, which was valid until June 2016. AN was placed on an assignment restriction beginning in or around August 2010, and lasting through his resignation from the State Department in 2014.[1] The restriction provided that AN could not serve in an assignment (physical posting) in China and Hong Kong.

22. In October 2015, AN received an Interim Secret clearance to work for CDC1 for the benefit of DOD. This clearance lapsed in or around March 2017 after AN transitioned to a "Leave of Academic Absence" status, which is valid through September 2019. This designation means that the clearance process for AN had stopped or lapsed (since AN's clearance never evolved from "Interim Secret" to "Secret"), but could be reinitiated in the event that AN transitions to full time employment with CDC1.

23. In AN's initial employment application submitted to CDC1 in 2015, AN asserted that he had program management experience on third party transfer teams and single handedly managed the government interagency review process for arms sales retransfer requests from East Asian counties. AN's experience reflected business development by introducing American defense companies to case officers at the Directorate for Defense Trade Controls (DDTC) to export specific defense products and services.[2]

---

[1] The State Department Diplomatic Security Service (DSS) initiated an investigation into AN in or about June 2009 following AN's marriage to a Taiwanese national. Thereafter, DSS recommended an assignment restriction in 2010, and his assignment restriction was affirmed after an adjudicative analysis was conducted in 2011. This formal adjudication by DSS/Office of Personnel Security/ Suitability concluded that AN had issues related to "Foreign Influence" and "Personal Conduct." Although a counterintelligence review recommended continued employment of AN, it was determined that AN's assignment restriction should be maintained based on an elevated counterintelligence risk posed by the aforementioned factors. Despite this restriction, AN's security clearance elevated from a Secret designation to a Top Secret on the same day, but he was not eligible for Sensitive Compartmental Information (SCI) access.

[2] The Directorate of Defense Trade Controls is the department that ensures commercial exports of defense articles and

AFFIDAVIT OF FBI SA ANDREA N. WINTERNITZ                                                    5

### D. AN's Contacts with Foreign Government Agents

24. After leaving the State Department, AN and Anne moved from Washington, D.C. to the San Francisco Bay Area (in or around April 2015). Shortly thereafter, in or around June 2015, AN met a Taiwanese official (hereinafter "TAW1") assigned to the local TECO office (SF TECO) at a Taiwan event at Stanford University.

25. In November 2015, AN began his employment as a Senior Project Manager at the cleared defense contractor (CDC1) in Sunnyvale, California.

26. In February 2016, FBI agents observed AN, TAW1, and TAW2, playing golf together in Northern California.

27. In March 2016, TAW1 left his assignment in the United States and was replaced by TAW3. Pursuant to a court order, FBI obtained electronic communications between AN and TAW3. I have reviewed some of that correspondence, and I am aware that during the course of their relationship, AN received information that revealed TAW3's affiliation with the government of Taiwan and the NSB.

28. During the course of its investigation, the FBI observed AN meeting TAW2 and TAW3 on several occasions, typically at restaurants in Northern California.

29. On June 22, 2016, for instance, FBI physical surveillance agents observed AN meet TAW2 and TAW3 at an identified Bay Area restaurant at approximately 11:40 a.m

   a. During the meeting, AN, TAW2, and TAW3 primarily spoke in Mandarin Chinese. AN was observed carrying a bundle of white sheets of paper with him into the restaurant. During this lunch meeting, a Chinese proficient FBI physical surveillance specialist overheard parts of the conversation between TAW2, TAW3, and AN. According to the specialist, TAW2 advised AN that "they" should cooperate or consult more, because TAW2 and TAW3 need AN's help.

   b. At approximately 11:55 a.m., AN pulled out the paperwork and began showing it to TAW2. According to the specialist, AN talked about AN's research and budgets, engineer problems, customers, etc. AN also mentioned the term "drones" and used the term "unclassified." AN and TAW2

---

defense services are consistent with U.S. national security and foreign policy objectives.

AFFIDAVIT OF FBI SA ANDREA N. WINTERNITZ                                    6

could also be heard also briefly discussing TAW1. At the conclusion of the meal, AN asked TAW2 if he wanted to take the paperwork, and handed it to TAW2. TAW2 then paid for the bill.

30. On July 8, 2016, FBI physical surveillance agents observed AN, Anne, TAW2 and TAW3 go to dinner at an identified Bay Area restaurant. When TAW2 and TAW3 arrived at the restaurant, TAW3 was observed carrying two bags that appeared to contain two wrapped gifts. AN and Anne were not observed carrying any bags with them. At the end of the meal, the agents observed TAW3 handing a wrapped gift item to AN and Anne. Anne opened the box, which appeared to contain a bottle of liquor. AN and Anne were overheard admiring the gift and graciously accepting it. Anne received a second wrapped item from TAW2 and TAW3, which appeared to contain baby clothes.

E. **Mortgage Fraud – 18 U.S.C. §1344**

31. During the course of the investigation into AN's contacts with Taiwan officials, FBI agents discovered that AN submitted a false loan application to a federally-insured credit union. The loan was false because it claimed material income from a lease that did not, in truth, exist. The false application was supported by a phony lease executed by Howard Young, a friend of AN's.

32. Beginning in September 2018, AN and Anne began searching to buy a home in Washington D.C.

33. AN established an account with the Navy Federal Credit Union (NFCU) on October 1, 2018. On the same day, Anne submitted a mortgage application to NFCU (Loan Application No. 8030992914). This loan application sought a mortgage loan in the amount of $575,000. Anne sent AN an e-mail on October 1, 2018, reminding AN they needed to get their tax returns and "...get a signed contract for the 2107 home." Anne's loan application was for the purchase of real property in Washington, D.C., though the couple did not end up purchasing this home.

34. In late November 2018, the couple asked an NFCU representative about adding AN to the loan application in order to qualify for a larger loan. A new loan application (Loan No. 8031046348) was initiated on November 28, 2018. The couple's joint mortgage application (8031046348) with NFCU was for a loan over $200,000 more than Anne requested in October, in the amount of approximately $778,500.

AFFIDAVIT OF FBI SA ANDREA N. WINTERNITZ                                    7

35. Shortly after submitting the joint mortgage application, NFCU asked AN clarifying questions about the couple's rental property at 2107 2nd Street, Washington, D.C., and its corresponding liabilities. On November 30, 2018, Anne responded in an e-mail to the NFCU representative:

> Yes, we currently have a HELOC open for $68K and we have a mortgage with Wells Fargo for our 2107 2nd St. home. We are currently living in the house but we have a contract to lease our 2107 2nd St. NE home for $3490/month[3] if we decide to buy a new home.

36. The NFCU representative reaffirmed to Anne by email that the loan would be conditioned on the applicants receiving $3,490 per month (to include a 25% vacancy factor). The NFCU representative further advised s/he submitted the file to the Underwriters as a "RUSH." The NFCU representative continued, "[i]n my experience, as long as we are able to satisfy the conditions - lease agreement, canceled checks to show mortgage payment is covered - we should be able to close without a problem. I don't foresee the debt to income ratio being a problem but wanted a review of this to ensure we have no surprises!"

37. Prior to Anne's representations in November that the couple had a contract to lease the home for $3,490 a month, in or around October 2018, AN had asked Young, a resident of San Jose, California, to sign a lease for "them." During an October 4, 2018 conversation, which was recorded pursuant to a court order, AN told Howard they needed the lease for the purchase of a new home. AN said that he intended on renting the home to an Airbnb superhost, but "they" were lagging so AN needed a back-up plan. AN explained he would e-mail the signed lease to Young. Young assured AN Young could make a deposit if needed as long as Young got his money back. Young used a telephone with a (408) area code.

38. On or about October 4, 2018, AN e-mailed Young a signed month-to-month lease agreement for the residence located at 2107 2nd Street, N.W., Washington D.C. 20002. Young signed the lease and e-mailed it back to AN on October 5, 2018.

---

[3] FBI investigation indicated AN and his spouse had a legitimate lessor renting a room in their home on a month-to-month basis. This identified renter paid approximately $990 per month for the room. The month-to-month lease Young signed (see infra) and dated 10/04/2018, was for $2,500 per month. As a result, the FBI believes the total $3,490/ month Anne described in her response to NFCU represents the legitimate $990 the couple had been receiving from the identified renter and the misrepresented sum of $2,500 the couple claimed they would receive from Young.

39. A few hours later, on October 5, 2018, AN e-mailed a document to Young, entitled "2018.10.05 void DC house contract.pdf." This document contained the same lease AN and Young had signed, but each page had been designated "VOID" with AN's initials.

40. Later on October 5, 2018, AN called Young and Young confirmed he signed the contract and sent it back. Again, AN reiterated signing the lease was their "back-up plan." In response to a question about a separate matter, Young advised he had not checked the e-mail that was sent to his account.

41. Several days later on October 10, 2018, Young sent an e-mail to an identified customer from his account and sent a carbon copy to AN. This e-mail contained an attachment for an Invoice dated October 10, 2018. Young's address on the invoice was listed as "967 Edenbury Lane, San Jose, California, 95136," which was at that time and currently is Young's residence.

42. On or about December 6, 2018, AN and Anne engaged in the following text message exchange:

| | |
|---|---|
| Anne: | What do we do with the 2107 house lease? |
| | Can you ask Howard sign? |
| AN: | Yeah. I'll call Howard about it now. |
| Anne: | Ok |
| | Thanks! |
| | Same contract just different dates |
| | Don't increase the price since I don't want to make it suspicious |
| AN: | Ok. |

43. About eight minutes after this exchange, AN sent Young the following text message(s), "Hey Howard, how's it going? I'm planning some public seminars on defense issues that I think you would find interesting. A lot of planning to do these days, but then Christmas vacation is coming up soon and we might be in Florida for some warm weather. Can I give you a call this afternoon? David."

44. Over an hour later on December 6, 2018, Anne and AN exchanged the following texts:

Anne: Did you talk to Howard?

| | | |
|---|---|---|
| AN: | Fyi that I called, text messaged, and e-mailed Howard and I am waiting for him to respond | |
| Anne: | Ok | |

45. On December 10, 2018, AN called Young and informed Young that they were in the process of buying another home, like the last time. AN further advised that AN needed a favor from Young and explained AN wanted to change the date from the previous contact. AN preferred to adjust the date to January 1, 2019.

46. On December 11, 2018, AN sent Anne an e-mail that contained an attachment. In his message, AN stated, "Honey, here is the signed lease agreement from Howard. I'll call you soon to discuss." The attachment contained a lease executed by AN, Anne, and Howard C. Young. This month-to-month house rental agreement for a unit located at 2107 2nd Street, N.E. Washington, D.C.. This agreement was for a month-to-month lease and $2,500 per month in rent due at the 1st day of each month.

47. The FBI obtained the loan file from the NFCU. The file reveals that, AN and Anne submitted a lease executed by Howard C. Young, in support of their loan application. This lease was signed by AN, Anne, and Young and dated October 4, 2018.[4] The lease reflects a month-to-month tenancy agreement for a basement unit located at 2107 2nd Street, N.E., Washington, D.C. 2002. The rent specified Young would pay the landlord $2,500 per month. The lease also specified a $2,500 security deposit would be paid by the lessor (Young).

48. On or about December 28, 2018, NFCU funded the loan (8031046348) for AN and Anne in the amount of $778,550. AN and Anne used the loan proceeds to purchase a home located at 4434 Kansas Avenue, N.W., Washington D.C. 20011, where they currently reside.

49. In December 2018, FBI physical surveillance agents conducted surveillance activities at 2107 2nd Street in Washington, D.C. This surveillance confirmed observations of AN, Anne, their minor child, and the identified lessor referenced in footnote 3.

50. Young does not reside at the 2nd Street address in Washington, D.C., as the lease purports

---

[4] It appears that AN and Anne used the false lease signed by Young in October 2018 rather than the false lease discussed in December 2018.

AFFIDAVIT OF FBI SA ANDREA N. WINTERNITZ                                            10

to assert. FBI employees ran Young in California Law Enforcement Telecommunication System (CLETS) on August 2, 2019. DMV records show that his mailing address as of July 27, 2018, is the SUBJECT PREMISES, 967 Edenbury Lane, San Jose, CA. His registered vehicle records show that Young has an Acura (CA Plate 6MOS252) registered to him at 967 Edenbury Lane from 5/28/2019 to 5/28/2020. On July 12, 2019, the FBI observed Young's Acura (CA Plate 6MOS252) at the Edenbury residence. The FBI observed Young at the residence most recently on June 20 and August 5, 2019.

### F. Interview and False Statement to FBI

51. FBI agents interviewed AN on December 5, 2018. Prior to the voluntary interview, the primary interviewing agent provided a business card identifying her affiliation with the FBI from the San Francisco Field Office. During the interview, the agents informed AN that they were conducting an investigation regarding, among other things, his contacts with representatives of the government of Taiwan. The agents explained to AN that they were conducting the investigation from the San Francisco office of the FBI. The agents were not aware of the facts related to the mortgage fraud at the time of this interview and did not act AN questions about it.

52. During the interview, the agents asked AN about his contacts with foreign officials, in particular those who were assigned to the TECO and TECRO departments. AN acknowledged he had a relationship with TAW1, TAW2, and TAW3. AN explained he met TAW1 and TAW2 about three years ago at a public event where the Taiwanese President's remarks were being publicized. AN advised he was aware TAW1 and TAW2 were representatives of the Taiwanese government. As previously discussed, AN had an interim Secret clearance when he developed his relationship with TAW1, TAW2, and TAW3. AN did not report the close and continuing relationship he maintained with these foreign officials, including the gifts and benefits AN received as a result of his unreported relationships with TAW1, TAW2 and TAW3 while AN was employed at CDC1. According to AN, AN continued to socialize with these officials after this event and was introduced to TAW3 after TAW1's assignment in the United States had ended.

53. The agents also asked AN more details about his relationship with TAW2 and TAW3, including whether he had ever received gifts from either of them. AN falsely stated that he had never

received gifts from them. AN was asked this several times during the interview. I know this is false because AN was observed by FBI agents receiving gifts from TAW2 and TAW3 on July 8, 2016.

## V. CONCLUSION

54. Based on the foregoing information, I believe there is probable cause to believe that on December 5, 2018, DAVID TAWEI AN made a materially false statement to FBI agents, in violation of Title 18, United States Code, Section 1001, and that from October through December 2018 AN conspired to execute a scheme and artifice to defraud a federally-insured financial institution, in violation of 18 U.S.C. §§ 1344 and 1349.

55. Because of the nature of this application and the fact that the investigation is ongoing, it is further requested that this application be sealed and remain under seal until further order of this Court or another court of competent jurisdiction, except that the United States Attorney's Office for the Northern District of California and Special Agents of FBI may disclose this affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of AN.

Andrea N. Winternitz
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ___6___ day of August, 2019.

THE HONORABLE NATHANAEL COUSINS
UNITED STATES MAGISTRATE JUDGE